UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DOMINIC DUPONT,

                    Petitioner,                  **<u>MEMORANDUM AND ORDER</u>**
                                                    05-CV-3426 (RRM)

     - against -

WILLIAM PHILLIPS,

                    Respondent.
-----------------------------------------------------------X

ROSLYNN R. MAUSKOPF, United States District Judge.

On May 4, 1998, Dominic Dupont was convicted in New York Supreme Court of murdering Nolan Profitt. At trial, the prosecutor denied possessing the victim's clothing and never presented it as evidence, even though gunpowder patterns on the clothing could have confirmed witness testimony that Profitt was shot at close range during a scuffle with Dupont. After he was sentenced, Dupont uncovered that the police had in fact vouchered Profitt's clothing shortly after the murder. A state collateral proceeding determined that both the prosecutor and defense counsel had evidence before trial that the clothing had been vouchered, although both were clearly unaware of this fact throughout the trial and subsequent proceedings. In the end, the clothing proved not to be exculpatory or impeaching, as later testing revealed gunpowder patterns consistent with a close-range shooting.

On September 5, 2006, Dupont moved this Court *pro se* for entry of an amended petition seeking a writ of *habeas corpus* under 28 U.S.C. § 2254. In his amended petition, Dupont alleges that the trial and appellate prosecutors violated *Brady v. Maryland*, 373 U.S. 83 (1963), by knowingly withholding the victim's clothing, and committed misconduct by misrepresenting that the police did not possess the clothing. Dupont also alleges that the People should have been

sanctioned for failing to provide him with the clothing, that his trial and appellate counsel provided ineffective assistance, and that the trial evidence was legally insufficient to prove that he acted with depraved indifference to human life.

For the reasons set forth below, the Court finds petitioner's claims are without merit, and DISMISSES the amended petition in its entirety.

## BACKGROUND

### I. Trial

Petitioner Dominic Dupont was charged under Kings County Indictment Number 627/97 with two counts of Murder in the Second Degree (N.Y. Penal Law § 125.25(1), (2)) and one count each of Criminal Possession of a Weapon in the Second Degree (§ 265.03) and Third Degree (§ 265.02(4)). (Aff. Opp. Pet. Writ Habeas Corpus ("Opp. Aff.") (Doc No. 10) at 2.) Petitioner's trial commenced on April 27, 1998 before Supreme Court Justice Robert S. Kreindler and a Brooklyn jury. (Opp. Aff. Ex. R, Trial Transcript ("Tr.") at 1.)

Trial witness Robert Cush ("Cush") testified that on June 4, 1997, shortly before 7:40 p.m., he and his cousin, the decedent Nolan Profitt ("Profitt"), were walking down Foster Avenue in Brooklyn. (*Id.* at 321–30.) Petitioner's fraternal twin brother Nolan Dupont approached Cush and Profitt, and repeatedly asked them if they had a problem with him or "his boys." (*Id.* at 334.) While Cush was talking with petitioner's brother, petitioner and his associate Wendall Derilus ("Derilus") approached Cush from behind. (*Id.* at 335–36.) From about three car lengths away, petitioner ordered his brother to get out of the way so petitioner could "baddy those niggers" — that is, kill Cush and Profitt. (*Id.* at 336–39.) When Cush turned around he saw petitioner holding a nickel chrome plated gun. (*Id.* at 338–39.) Cush then pushed Derilus aside

and fled across Nostrand Avenue, but fell between two cars. (*Id.* at 340–44.) Petitioner's brother and Derilus caught up to Cush and began to hit him. (*Id.* at 344–46.)

Cush testified that his other cousin, Beverly Moffatt ("Moffatt"), saw the beating and rushed over, grabbing a hold of petitioner's brother. (*Id.* at 346.) Petitioner ordered Moffatt to let go of his brother, and Moffatt complied. (*Id.* at 350–51.) According to Cush, Profitt then began to scuffle with petitioner, who proceeded to place Profitt in a headlock. (*Id.* at 351.) Cush "heard the gun go off," and saw Profitt fall to the ground. (*Id.* at 354–55.) Cush saw petitioner pick two guns off of the ground, and then run off with his brother. (*Id.* at 355.) An autopsy later determined that Profitt died from a gunshot wound to the torso. (*Id.* at 806.)

Moffatt likewise testified at trial that she came upon petitioner's brother and Derilus hitting Cush, and that she grabbed a hold of petitioner's brother, while another witness, Eustace Scantelbury ("Scantelbury") grabbed Derilus. (*Id.* at 515–17.) According to Moffatt, petitioner then drew a silver gun from his waist and ordered Moffatt to "back the fuck up." (*Id.* at 517–18.) After Moffatt released petitioner's brother, petitioner grabbed Profitt from behind and began to fight with him. Moffatt testified that during the fight, petitioner ended up holding Profitt from behind with his right arm, and reached around to shoot him in the chest with the gun in his left hand. (*Id.* at 521, 536.) According to Moffatt, petitioner then threw the gun into a green car and fled in the car. (*Id.* at 539–40.)

Scantelbury also testified at trial that he attempted to intervene between Cush and his two assailants, but that petitioner drew a "shined out gray gun" and ordered him to "back the 'F' up." (*Id.* at 655–56.) Scantelbury, however, testified that at the time of the shooting, Profitt was holding petitioner from behind, and not the other way around. (*Id.* 657, 687.) According to

3

Scantelbury, petitioner used the gun in his left hand to shoot Profitt in the chest over petitioner's own right shoulder. (*Id.* at 693.)

The day after the murder, Detective Frank Roman received an anonymous phone call directing the police to 1351 New York Avenue in Brooklyn, the building where petitioner lived. (*Id.* at 689–99.) There, on the roof, the detective recovered a nickel plated .380 caliber semi-automatic handgun and a .357 magnum revolver. (*Id.* at 699–701, 706.) Detective Robert Tamburri, who was identified at trial as an expert in firearms and microscopic comparisons, later determined that a discharged bullet found at the crime scene matched the .380 handgun. (*Id.* at 765–66.)

Medical examiner Stephen DeRoux examined Profitt's body, which he testified was delivered to him unclothed. (*Id.* at 800.) DeRoux located one entry would and one exit wound in Profitt's upper torso. (*Id.* at 801.) DeRoux found no "contact wound" as would be expected if the muzzle were in contact with the body at the time of discharge, nor any "stippling" or "fouling" as would be expected if the gun were fired within eighteen inches of the body without clothing. (*Id.* at 810–13.) DeRoux testified, however, that Profitt's clothing would have affected how much fouling or stippling DeRoux would expect to find on the body. (*Id.* at 809.) DeRoux stated that "[i]f the deceased was wearing clothing at the time and the bullet went through the clothing, then all bets are off as far as the distance unless we have the clothing for either examination or testing." (*Id.* at 827.)

Before closing arguments, petitioner's trial counsel requested an adverse inference instruction[1] based on the prosecution's failure to produce Profitt's clothing for examination. (*Id.* at 862–70.) The trial prosecutor, then-Assistant District Attorney Danielle V. Eaddy, affirmed to

---

[1] An adverse inference instruction is one that states to the jury that they may draw an adverse inference against the People for their failure to produce material evidence under their control. *See* 34 N.Y. Jur. 2d Criminal Law: Procedure § 2754 (2012).

Justice Kreindler that she did not know the location of Profitt's clothing. (*Id.* at 863.) Justice Kreindler gave ADA Eaddy ninety minutes to reopen the case and establish what happened to the clothing, warning her that a "missing evidence charge with respect to the deceased's clothing" would issue if she was unready to reopen the case at that time. (*Id.* at 864–65.) Eaddy objected, stating that "[t]here is no testimony that this clothing was evidence in the People's possession" and asking, "Why should that be attributed to the People . . . ?" (*Id.* at 865–66.)

After a short recess, Justice Kreindler asked petitioner's trial counsel for the basis on which he sought the adverse charge. (*Id.* at 867.) Trial counsel explained that a lack of fouling or stippling on the clothing would challenge the credibility of the witnesses and their descriptions of the shooting, as it would indicate that the gun, "if you include the sizing of the barrel, had to be two feet to the deceased's right when it was fired." (*Id.* at 868.)

Justice Kreindler decided not to issue the charge "because, number one, it's only on the issue of credibility and, number two, . . . there has been nothing in the case to indicate that the police had anything to do with the missing clothing." (*Id.* at 869.) However, trial counsel was permitted in summation to address the absence of the clothing, and the failure of the police to preserve it. (*Id.* at 917–19.) Accordingly, trial counsel argued before the jury that because no stippling or fouling was found on Profitt's body, "the gun must have been two feet from the individual, from the point of impact. If they want to tell you different, then they can find the clothes." (*Id.* at 915.) Trial counsel then reenacted the fight as described by Moffatt and as described by Scantelbury, arguing that in either configuration petitioner could not reach far enough to hold the gun two feet from Profitt during the scuffle. (*Id.* at 918–19.) ADA Eaddy reminded the jury in her summation that DeRoux said he could not form an opinion about the

5

distance between the gun and the victim without knowing if stippling or powder were on the clothing. (*Id.* at 948–49.)

Petitioner was convicted of depraved indifference murder in the second degree and criminal possession of a weapon in the second degree, and was sentenced to concurrent prison terms of twenty-five years to life for the murder and seven and one-half to fifteen years for the weapon possession.

## II. Direct Appeal

Petitioner appealed from his judgment of conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"). *See* N.Y. Crim. Proc. Law §450.10(1). Petitioner's appellate counsel, Cynthia Colt of the Legal Aid Society, filed a forty-six page brief on petitioner's behalf, raising the following claims:

1. The People had failed to prove that petitioner was the shooter, and even assuming that petitioner was the shooter, the People had failed to prove that he had acted with depraved indifference;

2. The trial court had denied petitioner his right to a fair trial by refusing to order a hearing to determine whether the prosecution possessed the victim's clothing; and

3. The sentence was harsh and excessive.

In a *pro se* supplemental brief to the Appellate Division, petitioner further claimed that:

4. The trial court had erred in concluding that the petitioner failed to establish a *prima facie* case of discrimination by the prosecutor in jury selection.

By decision and order dated May 21, 2001, the Appellate Division unanimously affirmed petitioner's conviction and sentence. *People v. Dupont*, 283 A.D.2d 587, 724 N.Y.S.2d 901 (App Div. 2d Dep't 2001). The Appellate Division found that petitioner's legal insufficiency claim

was unpreserved for appellate review and, in any event, meritless. *Id.* The Appellate Division further held that the verdict was not against the weight of the evidence. *Id.* Finally, the Appellate Division concluded that petitioner's remaining contentions, including those raised in his *pro se* supplemental brief, were without merit. *Id.*

Petitioner applied for permission to appeal to the New York Court of Appeals. *See* N.Y. Crim. Proc. Law §§ 450.90, 460.20. By certificate dated October 12, 2001, a judge of the Court of Appeals denied petitioner permission to appeal further. *People v. Dupont*, 97 N.Y.2d 640, 735 N.Y.S.2d 497 (2001).

### III. First § 440 Proceeding

By papers dated "March, 2002," and filed on May 20, 2002, petitioner moved, pursuant to New York Crim. Proc. Law § 440.10, for an order vacating his judgment of conviction. (Opp. Aff. Ex. E.) Petitioner claimed that his rights to due process and a fair trial were violated by the trial court's failure to sanction the People for not providing petitioner with the deceased's clothing. (*Id.*)

In a decision and order dated September 18, 2002, the New York Supreme Court, Kings County, denied petitioner's motion. (Opp. Aff. Ex. G.) The court held that petitioner's claim was procedurally barred from review. *See* N.Y. Crim. Proc. Law §§ 440.10(2)(a), (c). In an order dated January 13, 2003, the Appellate Division refused to grant petitioner leave to appeal the decision.

### IV. FOIL Requests and Article 78 Proceeding

By a letter dated February 6, 2003, petitioner made a New York Freedom of Information Law ("FOIL") request to the Kings County District Attorney's office for records relating to his criminal case. In response to that request, on June 9, 2003, the office disclosed a six page

Homicide Investigative Report. The Report identified the officer who recovered Profitt's clothing, and the police voucher numbers under which it was collected.

Petitioner then made a second FOIL request for these vouchers, and for the results of any scientific tests conducted on the clothing. On September 15, 2003, the office disclosed *inter alia* police voucher G909854 dated June 4, 1997, which indicated the recovery of Profitt's sneakers, jacket, shirt, T-shirt, jeans, and underwear.

On or around June 12, 2003, while petitioner was awaiting the office's disclosures, he commenced an Article 78 proceeding demanding that the office turn over all police vouchers from his case, and any results of scientific tests conducted on the vouchered evidence. In response, the office argued that this disclosure had already been made to petitioner's attorney before trial. The office provided a copy of an April 13, 1998 affirmation prepared by ADA Eaddy entitled "Rosario Material," listing a number of documents provided to counsel before trial under the reporting requirements of N.Y. Crim. Proc. Law § 240.45 and *People v. Rosario*, 9 N.Y.2d 286, 173 N.E.2d 881 (1961)[2], including booking sheets, ballistics examination reports, handwritten detective notes, and grand jury testimony for all trial witnesses. The list includes entries for "Voucher #'s G909854-857, G909873, G909878" as well as a "District Attorney's Scratch Report," which listed in relevant part "Physical Evidence G909855- Various Clothing and personal affects [sic] of Decedent[.] P.O. Braithwaite, 26186, 67 PCT recov. and vouchered the above items." (*See* Opp. Aff. Ex. N at 10.) In reply, petitioner's trial counsel submitted a sworn affirmation that he was not provided the "Rosario Material" form, the police vouchers, or the test results before trial. (Mem. Law Supp. Am. Pet. ("Pet'r's Mem.") (Doc. No 13) at 18.)

In an order dated August 14, 2003, the Supreme Court denied without prejudice petitioner's request for police vouchers and scientific test results, ordering him to first attempt to

---

[2] *Rosario* requires the prosecution to turn over witnesses' prior statements before they testify in court.

recover them from his trial counsel. *See Dupont v. Kings County, Dist. Attorney's Office*, Index # 19065/03, 2003 WL 22011317, at *2 (N.Y. Sup. Aug. 14, 2003), *aff'd in pertinent part at* 15 A.D.3d 480, 790 N.Y.S.2d 505 (App. Div. 2d Dep't 2005).

**V. Second § 440 Proceeding**

By papers dated June 25, 2004, petitioner moved for a second time under New York Crim. Proc. Law § 440.10 for an order vacating his judgment of conviction. Petitioner, relying on the results of his FOIL request, claimed that the prosecutor deliberately withheld exculpatory material, namely Profitt's clothing. In the alternative, petitioner argued that if, in fact, the prosecutor had provided trial counsel with disclosures indicating police possession of the clothing, trial counsel's ignorance thereof constituted ineffective assistance. (Opp. Aff. Ex. M.)

As in petitioner's Article 78 proceeding, the People alleged that the vouchers and fifteen-page "scratch" report had been provided to petitioner before trial. (Opp. Aff. Ex. N. at 10.) The People also asked the Court to have Profitt's now-located clothing tested for the presence of gunshot residue patterns, and compared to the murder weapon to determine a muzzle-to-target distance. (*Id.* at 11.) Those tests determined that a "pattern of residue consistent with the discharge of a firearm was found around hole Q1 in the jacket" and that "[c]omparison of the residue pattern around hole Q1 with those generated by [the murder] weapon indicates a muzzle-to-target distance of less than 18" but not in contact with the jacket." (*Id.*) The People argued that Profitt's clothing had not been withheld, and that, in any event, the test results confirmed that the clothing was neither exculpatory nor impeaching.

By decision and order dated March 16, 2005, the New York Supreme Court, Kings County (Feldman, J.) denied petitioner's motion to vacate his judgment of conviction. The court rejected petitioner's argument that the People "deliberately misled the court when they stated

that the clothing was not in their possession," concluding instead that it was "clear from the record that the trial assistant in making the representation failed to review her file carefully." (Opp. Aff. Ex. O at 2.) The court also concluded that "police reports, which were also available to the defense, revealed that the police had recovered decedent's clothing" and thus that any misrepresentation was "solely the result of carelessness." (*Id.* at 2–3.) The court noted that "tests belatedly conducted on the clothing in fact corroborated the testimony of the two witnesses concerning the close range of the shooting." (*Id.* at 3.) The court recognized that Scantelbury's testimony suggested a manslaughter verdict while Moffatt's testimony pointed toward depraved indifference murder, but concluded that the "result of testing on the clothing does not lessen the credibility of either witness" and therefore that "there is no reasonable probability that had the clothing been tested and available at trial a result more favorable to the defendant would have been forthcoming." (*Id.* at 3–4). Finally, the court held that petitioner's ineffective assistance of trial counsel claim was "totally without merit." (*Id.* at 4.) In an order dated June 7, 2005, the Appellate Division refused to grant petitioner leave to appeal.

### VI. *Coram Nobis* Proceedings

After receiving the decision in his article 78 proceeding, but before filing his second § 440 motion, petitioner twice moved in the Appellate Division for writs of error *coram nobis*.

In papers dated August 14, 2003, petitioner claimed that his appellate counsel provided ineffective assistance because she never challenged the efficacy of trial counsel, who failed to object to certain alleged hearsay testimony and failed to object when the prosecution introduced into evidence a weapon that allegedly had no relevance to the case. In a decision and order dated November 17, 2003, the Appellate Division concluded that petitioner had not been deprived of the effective assistance of appellate counsel and denied the *coram nobis* motion. *People v.*

10

*Dupont*, 1 A.D.3d 528, 767 N.Y.S.2d 241 (App. Div. 2d Dep't 2003). By certificate dated February 25, 2004, a judge of the Court of Appeals denied petitioner leave to appeal. *People v. Dupont*, 1 N.Y.3d 627, 808 N.E.2d 1285 (2004).

In papers dated March 1, 2004, petitioner claimed that he received ineffective assistance when appellate counsel failed to claim on appeal that the trial court had erroneously ruled that petitioner had failed to establish a prima facie case of discrimination by the prosecutor in exercising peremptory challenges during jury selection. In a decision and order dated May 24, 2004, the Appellate Division concluded that petitioner had not been deprived of the effective assistance of appellate counsel and denied petitioner's second *coram nobis* motion. *People v. Dupont*, 7 A.D.3d 809, 776 N.Y.S.2d 882 (App. Div. 2d Dep't 2004). By certificate dated November 8, 2004, a judge of the Court of Appeals denied petitioner leave to appeal. *People v. Dupont*, 3 N.Y.3d 756, 821 N.E.2d 977 (2004).

After petitioner's second § 440 proceeding was completed, he moved in the Appellate Division a third time for a writ of error *coram nobis*. In papers dated February 10, 2006, petitioner claimed that he received ineffective assistance from his appellate counsel because counsel failed to argue on appeal that trial counsel was ineffective for not moving to dismiss the depraved indifference murder count before it was submitted to the jury for consideration. In a decision and order dated October 31, 2006, the Appellate Division concluded that petitioner had not been deprived of the effective assistance of appellate counsel and denied petitioner's third *coram nobis* motion. *People v. Dupont*, 33 A.D.3d 1018, 822 N.Y.S.2d 717 (App. Div. 2d Dep't 2006).

### VII. *Habeas* Petitions

By application dated June 13, 2005, petitioner applied to this Court for a writ of *habeas corpus*, raising the following ten claims.

1. The prosecutors committed misconduct by making "deceptive factual representations";

2. The trial prosecutor committed a Brady violation by suppressing evidence;

3. Petitioner's trial counsel provided ineffective assistance because he failed to "utilize critical impeachment evidence";

4. The prosecutor's alleged misconduct created a double jeopardy violation;

5. The evidence at trial was legally insufficient to prove that petitioner was the shooter or that he had acted with depraved indifference to human life;

6. The trial court improperly failed to order a hearing to discern the location of the victim's clothing;

7. The court's imposition of a sentence which included a prison term of twenty-five years to life was an abuse of the court's discretion;

8. The court erroneously failed to impose a sanction for the People's failure to preserve the victim's clothing;

9. Petitioner's appellate counsel provided ineffective assistance because she failed to raise an ineffective assistance of trial counsel claim based upon counsel's failure to object to hearsay and the introduction of a weapon into evidence; and

10. Petitioner's appellate counsel provided ineffective assistance because she failed to challenge the trial court's ruling during jury selection that petitioner's trial counsel had failed to establish a prima facie case of racial discrimination.

In an order dated May 22, 2006, this Court found that the *habeas* petition was timely filed, and directed the respondent to show cause why the petition should not be granted. On August 2, 2006, the Kings County District Attorney's Office filed an opposition to the petition on behalf of respondent, addressing all ten claims.

On September 5, 2006, petitioner moved to amend his *habeas* petition pursuant to Rule 15(a). The amended petition replaced petitioner's original ten claims with the following six claims. (Pet'r's Mem. at 20.)

1. The prosecutors committed misconduct by making "deceptive factual representations";

2. The trial prosecutor committed a Brady violation by suppressing evidence;

3. The evidence at trial was legally insufficient to prove that petitioner acted with depraved indifference to human life;

4. Petitioner's appellate counsel provided ineffective assistance because she failed to raise (i) an ineffective assistance of trial counsel claim based upon counsel's failure to object to hearsay and the introduction of a weapon into evidence, and (ii) a claim challenging the trial court's ruling during jury selection that petitioner's trial counsel had failed to establish a prima facie case of racial discrimination;[3]

5. Petitioner's trial counsel provided ineffective assistance because he failed to "utilize critical impeachment evidence"; and

6. The court erroneously failed to impose a sanction for the People's failure to provide petitioner with the victim's clothing.

---

[3] Petitioner originally also argued that appellate counsel should have alleged that trial counsel was constitutionally ineffective in bringing an untimely challenge to the sufficiency of evidence for the depraved indifference murder count. Petitioner subsequently withdrew this portion of his ineffective assistance claim in a letter to the Court received on January 31, 2007 (Doc. No. 16.) Even if petitioner had not withdrawn this part of his claim, as discussed *supra*, it is in any event time-barred. Further, for the reasons addressed with respect to petitioner's third amended claim, any challenge to the sufficiency of evidence for the depraved indifference murder count would have been without merit.

The amended petition, unlike the original petition, included a supporting memorandum of law. Neither the Court nor respondent has responded to the filing of the amended petition.

## DISCUSSION

### I. AEDPA Standard of Review

Under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant *habeas* relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000); *accord Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006); *Ernst J. v. Stone*, 452 F.3d 186, 193 (2d Cir. 2006). The phrase, "clearly established Federal law," limits the law governing a *habeas* petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 365); *accord Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006).

"The 'unreasonable application' standard is independent of the 'contrary to' standard . . . [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law. *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005) (citing *Williams*, 529 U.S. at 410). A state court bases its decision on an "unreasonable application" of Supreme Court precedent if it correctly identifies

the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. *See Williams*, 529 U.S. at 413. A federal *habeas* court does not ask whether the state court's application of the governing law was erroneous or incorrect, but, rather, whether it was "objectively unreasonable." *Id.* at 408–10; *see also Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable.").

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

## II. Timeliness of the Amended Petition

Under AEDPA, a one-year statute of limitations governs *habeas corpus* petitions brought by state prisoners. The statute of limitations ordinarily begins to run when a conviction becomes final. *See* 28 U.S.C. § 2244(d)(1)(A). Where an appeal is sought with the New York Court of Appeals, a judgment becomes final ninety days from the date on which leave to appeal is denied, which is the amount of time a prisoner has to petition the United States Supreme Court for a writ of certiorari. *See* Sup. Ct. R. 13; *Clay v. United States*, 537 U.S. 522, 525 (2003); *Williams v.*

*Artuz*, 237 F.3d 147, 150 (2d Cir. 2001). A properly filed application for state post-conviction relief may toll the limitations period. See *Acosta v. Artuz*, 221 F.3d 117, 119 (2d Cir. 2000). The filing of a federal *habeas* petition does not, however, toll the statute of limitations. *See Duncan v. Walker*, 533 U.S. 167, 181–82 (2001).

All of petitioner's tolls had completed on June 7, 2005, with seventeen days remaining in which to file his petition. (*See* May 22, 2006 Order (Doc. No. 7).) Accordingly, his original June 13, 2005 petition was timely filed. Petitioner moved to enter an amended *habeas* petition on August 25, 2006. (Doc. No 14.)

Fed. R. Civ. P. 15(a) governs the grant or denial of a motion to amend a *habeas* petition. *Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001). Rule 15(a)(1) grants a plaintiff (or petitioner) a right to amend a pleading either 21 days after service of the pleading or, "if the pleading is one to which a response is required, 21 days after service of a responsive pleading . . . ." Fed. R. Civ. P. 15(a)(1)(A) & (B). Petitioner contends that Rule 15(a)(1)(B) allows him to amend his petition as of right, as he moved to amend within 21 days of service of respondent's answer. While courts have not consistently applied Rule 15(a)(1)(B) to *habeas* petitions[4], the Court will grant petitioner's motion, since respondent has not contested entry of the amendment and the Court is instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).

Whether or not petitioner's motion is considered timely under Rule 15(a), the amended petition was presented far outside AEDPA's independent statute of limitations, and the intervening filing of his third *coram nobis* motion on February 10, 2006 was too late to toll the

---

[4] For example, at least one magistrate judge in this circuit has questioned the applicability of subsection (a)(1)(B) to *habeas* petitions, because the filing of a *habeas* petition, unlike other pleadings governed by (a)(1)(B), does not trigger any obligation by an opposing party until the court orders a response. *See Soler v. United States*, Nos. 10 Civ. 4342(RJH)(MHD) & 05 Cr. 165(RJH), 2010 WL 4456343, at *2 (S.D.N.Y. Oct. 18, 2010) (Dolinger, U.S.M.J.), *report and recommendation adopted at* 2010 WL 5173858 (S.D.N.Y. Dec. 20, 2010).

limitations period. Accordingly, petitioner's amended claims, although now operative, are time-barred unless they "relate back" to the date on which the petition was filed. *See Mayle v. Felix*, 545 U.S. 644, 650 (2005).

Amendments to a *habeas* petition "relate back" only where the amendments arise out of the same "conduct, transaction, or occurrence" as timely filed claims. *Id.* at 648 (citing Fed. R. Civ. P. 15(c)(2)). A petitioner's trial and conviction are not the occurrences or conduct to which amendments can appropriately relate back. *See id.* at 662–64 ("If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance."). Rather, the original and proposed claims must be "tied to a common core of operative facts . . . ." *Id.* at 664.

Petitioner's third *coram nobis* motion and fourth amended *habeas* claim, both filed outside the statute of limitations, challenge *inter alia* the effectiveness of his appellate counsel for failing to identify trial counsel's untimely attempt to seek dismissal of his depraved indifference murder count. This claim relies on operative facts not set forth in the original petition, and accordingly does not relate back to the date on which the petition was filed. Accordingly, even if petitioner had not withdrawn this portion of his claim in his letter of January 31, 2007, this Court would find it time-barred.

The remainder of petitioner's fourth amended claim, and his other amended claims, are essentially duplicative of claims raised in his original petition.[5] Accordingly, the six claims in petitioner's amended *habeas* petition, as clarified by his letter of January 31, 2007, are properly

---

[5] Petitioner's first two amended claims are essentially identical to his first two original claims. Petitioner's third amended claim is essentially identical to his fifth original claim. Petitioner's fourth amended claim, except as noted *supra*, is essentially identical to his ninth and tenth original claims. Petitioner's fifth amended claim is essentially identical to his third original claim. Petitioner's sixth amended claim is essentially identical to his eighth original claim.

before this Court.[6] As respondent has already fully addressed the substance of the six operative

claims in its response of August 2, 2006, the Court requires no further briefing by respondent.

### III. Review of Petitioner's Claims

### A.  Petitioner's First Amended Claim (Prosecutorial Misconduct)

Petitioner's first amended claim accuses various prosecutors of repeatedly committing

misconduct by deliberately lying to petitioner's trial, appellate, and collateral courts, saying that

the People did not possess Profitt's clothing.

The United States Supreme Court has stated that prosecutors must "refrain from improper

methods calculated to produce a wrongful conviction . . . ." *Berger v. United States*, 295 U.S. 78,

88 (1935). Nevertheless, a *habeas* court's scope of review for claims of prosecutorial misconduct

is quite limited. To prevail on a claim of prosecutorial misconduct, a *habeas* petitioner must

show "that sort of egregious misconduct ... amount[ing] to a denial of constitutional due

process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48 (1974) (citations omitted). A

petitioner must show that he suffered "actual prejudice" by a prosecutor's comments having "a

substantial and injurious effect or influence in determining the jury's verdict." *See Tankleff v.

Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (*quoting Bentley v. Scully*, 41 F.3d 818, 823 (2d

Cir. 1994) (internal quotation marks and citation omitted in original)). In assessing the severity

of a prosecutor's misconduct, the Court may consider the "extent to which the misconduct was

---

[6] Because petitioner's amended petition renders his original petition of no legal effect, and because he has nowhere indicated that he intends for the Court to consider claims not raised in the amended petition, such claims are procedurally barred. *See Brown v. Rick*, No. 01 Civ.4310 (DC), 2003 WL 22801397, at *3 n.3 (S.D.N.Y. Nov. 25, 2003) (citing *International Controls Corp. v. Vesco*, 556 F.2d 665, 669 (2d Cir.1977)). In any event, all three claims abandoned by petitioner are without merit. As for petitioner's claim of a "double jeopardy violation" (original claim 4), because petitioner's other *habeas* claims are without merit, his conviction stands and his double jeopardy claim is moot. As for petitioner's claim that he was denied a fair trial when the state court failed to order a hearing to locate Profitt's clothing (original claim 6), as discussed *infra* at Section III.A no evidentiary hearing was necessary because the nonrecord facts he sought to establish would not have entitled him to relief. *See People v. Satterfield*, 66 N.Y.2d 796, 488 N.E.2d 834, 836 (1985). As to the length of petitioner's sentence (original claim 7), "no federal constitutional issue is presented where . . . the sentence is within the range proscribed by state law." *White v. Keane*, 969 F.2d 1381, 1383–84 (2d Cir. 1992). In this case, petitioner's sentence of 25 to life was the maximum allowable by law. N.Y. Penal Law § 70.00 (McKinney's 1995); (*see* Sentencing Tr. at 10.)

intentional." *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981); *accord United States v. Spivack*, 376 F. App'x 144, 145–46 (2d Cir. 2010); *Jackson v. Senkowski*, No. 03 CV 1965(JG), 2007 WL 2275848, at *12 (E.D.N.Y. Aug. 7, 2007).

At petitioner's second § 440 proceeding, the New York Supreme Court, Kings County rejected this claim, finding that any "misrepresentation" was "solely the result of carelessness." (Opp. Aff. Ex. O at 2.) Factual and credibility determinations made in a § 440 proceeding are afforded a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Shabazz v. Artuz*, 336 F.3d 154, 163 (2d Cir. 2003); *Batchilly v. Nance*, No. 08 Civ. 7150(GBD)(AJP), 2010 WL 1253921, at *40 (S.D.N.Y. Apr. 2, 2010) (collecting cases), *report and recommendation adopted at* 2011 WL 1226260 (S.D.N.Y. Mar 30, 2011).

Petitioner contends that these state court findings are not entitled to deference because they are unsupported by sufficient evidence, and because the state court failed to conduct an evidentiary hearing on the issue of intentional misrepresentation. (Pet'r's Mem. at 28 (citing *inter alia Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) ("Drake I")).) The § 440 court acted well within its authority in not holding an evidentiary hearing on petitioner's motion. No such hearing is required when a decision can be reached based on the trial record and a defendant's submissions. *Parisi v. Artus*, 2010 WL 4961746, at *9 (E.D.N.Y. Dec. 1, 2010) (citing *People v. Satterfield*, 66 N.Y.2d 796, 488 N.E.2d 834 (1985)). Here, the record of petitioner's trial, appeal, and prior collateral proceedings, along with the parties' various sworn statements and evidentiary submissions, adequately supported the state court's findings. Petitioner has not alleged how an evidentiary hearing would have provided the court with more or better information. Further, no evidentiary hearing is necessary when the nonrecord facts sought to be established are immaterial or would not entitle petitioner to relief. *Satterfield*, 488

N.E.2d at 836. The second § 440 court found that any misrepresentations by the prosecutors were not prejudicial, because the clothing was neither exculpatory nor impeaching, as discussed more fully below. Accordingly, the Court defers to the Kings County Supreme Court's factual and credibility determinations, including the determination that any misconduct by the prosecution was unintentional.

Even if, *arguendo*, petitioner could have proven in a hearing that prosecutors knowingly lied about the location of Profitt's clothing, under the facts of this case, those lies would not rise to a constitutional violation warranting *habeas* relief. Petitioner's second § 440 court ordered that Profitt's clothing be tested for the presence of gunshot residue patterns, and compared to test-fires from the murder weapon to determine muzzle-to-target distance. (Opp. Aff. Ex. N at 11.) Those belated tests found gunshot residue indicating a muzzle-to-target distance of less than 18" but not in contact with the jacket. The clothing therefore would not have impeached any of the three observer's versions of the murder.[7] Since Profitt's clothing was found to be neither exculpatory nor impeaching, any prosecutor's denial of its possession, intentional or not, did not cause Profitt actual prejudice. Therefore, under *Tankleff* he is not entitled to relief.

Petitioner argues that the People, by denying that it possessed the clothing, deprived him of a basis to impeach the quality of the police investigation. (Pet'r's Mem. at 39.) But petitioner's counsel was in fact permitted to argue in summation about the failure of the police to preserve the clothing. (Tr. at 917–19 ("What the cops did in this case makes the O.J. crew seem

---

[7] Petitioner continues to allege that the police conducted an earlier round of scientific testing on the clothing, and that the withheld results of that testing are presumably exculpatory. The allegation is unfounded. Petitioner infers that tests were conducted because the assistant district attorney made a statement during petitioner's Article 78 proceeding that "test results" had been previously provided to trial counsel. (Pet'r's Mem. at 17–18 n.3) Because the Article 78 judge found some of the ADA's statements "baffling, if not outright contradictory," he ordered that "[a]ll non-exempt items" were to be provided to petitioner. *See Dupont v. Kings County, Dist. Attorney's Office*, 2003 WL 22011317, at *4–5. No test results of the clothing were subsequently provided, (Pet'r's Mem. at 49), and petitioner's second § 440 judge ultimately determined that the clothes were never previously tested. (*Id.* at 37–38 & n.8.) The Court defers to this finding.

like Sherlock Holmes . . . Nobody knows where the clothing is. People who [sic] have the burden of presenting you with quality evidence but nobody knows where the clothing is.").) An admission by the trial prosecutor that the clothing was missing would have added nothing to this argument. If instead the prosecutor had located and tested the clothing, the results would only have corroborated the witness testimony and undercut any argument by defense counsel that the gun was discharged from a distance greater than two feet. Petitioner's police impeachment argument thus lacks merit.

Petitioner asks the court to analyze the prosecutors' alleged misconduct as though it were equivalent to the use of false evidence or testimony, and apply the stricter standard set forth in *United States v. Agurs*, 427 U.S. 97, 103 (1976). (Pet'r's Mem. at 26.) Under *Agurs*, a conviction obtained through the knowing use of false testimony must be set aside unless there is "no reasonable likelihood" that the false testimony could have affected the judgment of the jury. *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003) (citing *Agurs*, 427 U.S. at 103) (internal quotation marks omitted). The "strict standard of materiality" applied by *Agurs* is appropriate where prosecutorial misconduct "involve[s] a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104; *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) ("Drake II"). Petitioner's request would extend the *Agurs* standard beyond the use of false testimony to include repeated misrepresentations by a prosecutor to a judge. This would swallow the "substantial and injurious effect or influence" standard applied when misconduct does not involve evidence or testimony, including even misconduct during the delivery of a closing argument. *See Tankleff*, 135 F.3d at 252; *see, e.g.*, *Haynes v. Ercole*, No. 08–CV–3643 (JFB), 2011 WL 2341277, at *13 (E.D.N.Y. June 8, 2011); *see also Drake II*, 553 F.3d at 241 n.6.

Petitioner has provided no case from this Circuit applying *Agurs* in this manner, and this Court declines to so do.[8]

Because petitioner's state court hearing found no intentional misrepresentations by the prosecutors, and because the alleged misrepresentations, even if intentional, caused petitioner no actual prejudice, his first *habeas* claim for prosecutorial misconduct fails.[9]

### B.  Petitioner's Second Amended Claim (*Brady* Violation)

Petitioner's second amended claim accuses the trial prosecutor of violating *Brady* by knowingly withholding Profitt's clothing.

At petitioner's second § 440 proceeding, the New York Supreme Court determined from the People's past affirmations that the State provided the defense with police reports before trial indicating possession of Profitt's clothing. (Opp. Aff. Ex. O at 2–4.) The prosecutor's statements at trial, however, clearly alleged that the police did not possess the clothing. Even if these statements were inadvertent, *Brady* holds that the State may not suppress evidence favorable to an accused and material either to guilt or punishment, "irrespective of the good or bad faith of the prosecution." 373 U.S. at 87. The Court need not decide, however, whether the inconsistent statements here together constitute "suppression," because even if they do, petitioner has not otherwise made out a *prima facie* claim under *Brady*.

---

[8] Moreover, even if the prosecutors' alleged repeated lies required analysis under *Agurs*, the Court would not find a violation. If at any earlier point during petitioner's trial, appeal, or collateral hearings a prosecutor had conceded possession of the clothing, the court in all likelihood would have done exactly what petitioner's second § 440 court did and had the clothing analyzed, or at least made the clothing available to the defense for analysis. The analysis would have corroborated the trial testimony and not exculpated petitioner or otherwise impeached the trial evidence, and therefore would not have "affected the judgment of the jury" or other hearing officer. Petitioner contests that if the prosecutor had conceded possession of the clothing at the end of trial, the court would have issued a missing witness or adverse inference charge to the jury without ordering analysis of the clothing. This Court sees no "reasonable likelihood" of that outcome, as discussed *infra* in connection with petitioner's second amended claim.

[9] Petitioner alternatively argues that the alleged misconduct constitutes "structural" error necessitating a new trial. (Pet'r's Mem. at 33.) But even the use of perjured testimony does not constitute structural error, *see Shih Wei Su*, 335 F.3d at 126, and the misconduct alleged here is no more corrupting of the truth-seeking function.

Three elements comprise a successful *Brady* claim: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; 2) the evidence must have been suppressed by the People, either willfully or inadvertently; and 3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *DiSimone v. Phillips*, 461 F.3d 181, 192 (2d Cir. 2006); *see also Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995) (noting that evidence is considered "material" under Brady only if there is a reasonable probability that, had the evidence been disclosed, the result of the court proceeding would have been different.)

At petitioner's second § 440 proceeding, the New York Supreme Court found that "the tests belatedly conducted on the clothing in fact corroborated the testimony of the two witnesses concerning the close range of the shooting" and that the results of the tests did not "lessen the credibility of either witness." (Opp. Aff. Ex. O at 3–4.) Therefore, the court concluded, there was "no reasonable probability that had the clothing been tested and available at trial a more favorable result to the defendant would have been forthcoming." (*Id.* at 4.)

Petitioner argues that the court's conclusion constitutes an "unreasonable" application of *Brady*. (Pet'r's Mem. at 48–49.) He submits that suppression of the clothing was prejudicial because it prevented him from securing an "adverse inference" charge for the missing clothing, or a "missing witness" charge for the vouchering officer. (Pet'r's Mem. at 48–49.) But, as emphasized by the Supreme Court in *Strickler*, evidence must be exculpatory or impeaching to be considered "favorable" under *Brady*. *Strickler*, 527 U.S. at 281–82; *see United States v. Rodriguez*, 496 F.3d 221, 225–26 (2d Cir. 2007).[10] Profitt's clothing was ultimately determined

---

[10] *United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993), cited by petitioner, is distinguishable at least for this reason. In *Kojayan*, the government failed to turn over a cooperation agreement with a co-conspirator despite requests by the defense. *Id* at 1317. At trial, the government stated before the jury that it could not have called the co-conspirator to the stand, despite defendant's suggestions to the contrary. *Id.* at 1317–18. Defense counsel then requested a missing witness charge, but the request was denied because the defense had no evidence of an actual cooperation agreement. *Id.* at 1322. The Ninth Circuit found that the government violated *Brady* by failing to disclose the cooperation agreement, which would have supported the defendant's request for the missing witness

to be neither, and this Court defers to the factual findings supporting that determination. *See* 28 U.S.C. § 2254(e)(1). Accordingly, the clothing was not "favorable" to petitioner for *Brady* purposes.

Further, even if, *arguendo*, evidence could be considered "favorable" merely because its concealment prevented a defendant from securing an adverse charge, it is unclear that, absent this concealment, an adverse inference charge would even have issued in petitioner's case. An adverse inference charge is only one of several remedies for a disclosure delay or for the suppression or destruction of evidence. *See People v. Martinez*, 71 N.Y.2d 937, 940, 524 N.E.2d 134 (1988). The selection of the "appropriate" remedy is "committed to the sound discretion of the trial court," which must seek to "eliminate any prejudice to the defendant while protecting the interests of society." *People v. Kelly*, 62 N.Y.2d 516, 520–21, 467 N.E.2d 498, 500–01 (1984). Whether and how severely to sanction the prosecution turns on the willfulness of the nondisclosure, the importance of the evidence lost, and the extent of prejudice to the defendant caused by the nondisclosure. *See People v. Jackson*, 168 Misc. 2d 182, 637 N.Y.S.2d 158, 163 (App. Div. 2d Dep't 1995); *see also Martinez*, 71 N.Y.2d at 940 (noting that in determining an appropriate sanction, "while the degree of prosecutorial fault may be considered, the court's attention should focus primarily on the overriding need to eliminate prejudice to the defendant."). Failure to turn over Brady material early in the proceedings does not necessarily

---

instruction. *Id.* Thus, in *Kojayan*, the suppressed evidence—the cooperation agreement—facially impeached the government's argument before the jury, as it made clear that the missing witness was "not only available but that the prosecution could compel his appearance if it so chose." *Id.* Here, in contrast, production of the allegedly suppressed evidence—Profitt's clothing—would not have impeached any statement made to the jury by the prosecution, who was careful to avoid stating or implying that the clothing was inculpatory. (*See, e.g.,* Tr. at 869 ("Mr. Udell: . . . If you are going to have the District Attorney respond by saying, well, I am sure there was stippling— Ms. Eaddy: Judge, I know the law. I can't say that.".) Further, while in *Kojayan* use of the suppressed agreement could have ultimately helped to exculpate the defendant, here, examination of the suppressed clothing would only have inculpated petitioner, as determined by later testing. In any event, petitioner's reading of *Kojayan* to find a *per se Brady* violation whenever the People suppress evidence material to an adverse inference jury charge is not "clearly established Federal law as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1).

violate a defendant's right to a fair trial, so long as the defendant is afforded a meaningful opportunity to use the material. *People v. Jackson*, 637 N.Y.S.2d at 163 (citing *People v. Cortijo*, 523 N.Y.S.2d 463, 517 N.E.2d 1349 (1987)).

Petitioner surmises that despite the trial prosecutor's initial offer to "get a continuance and . . . have someone testify as to what, if any knowledge they have as to where the clothing is," (Tr. at 864), if the prosecutor had subsequently conceded to Judge Kreindler that the police possessed the clothing, Judge Kreindler would have simply issued an adverse inference charge without reopening the case to find and examine the clothing. Considering the prosecutor's proffer and the interests at stake, the Court finds petitioner's suggestion unlikely. Even if the trial court chose to treat the clothing as suppressed, trial counsel's later explanation that the clothing would be useful to the defense only for impeachment purposes left its exculpatory value completely speculative. As such, Justice Kreindler's ultimate decision in the case — to allow defense counsel to make strategic use of the absence of clothing in summation, and to prevent the prosecutor from arguing that the clothing was inculpatory — would have been appropriate with no additional requirement of an adverse charge. *See People v. Pfahler*, 179 A.D.2d 1062, 1063, 579 N.Y.S.2d 520 (App. Div. 4th Dep't 1992) (citing *People v. Scattareggia*, 152 A.D.2d 679, 680, 543 N.Y.S.2d 742 (App. Div. 2d Dept. 1989)).

Because Profitt's clothing was neither exculpatory nor impeaching, and because petitioner has not shown that its suppression prejudiced him, his second *habeas* claim for relief under *Brady* fails.

### C. Petitioner's Third Amended Claim (Legal Sufficiency)

Petitioner's third amended claim challenges that the evidence adduced at trial was legally insufficient to prove that he acted with depraved indifference to human life. (Pet'r's Mem. at 50.) This claim is procedurally barred, and in any event, without merit.

A claim is precluded from *habeas* review if: (1) the state court declined to address the petitioner's federal claim because he failed to meet a state procedural requirement, and (2) the state court decision rested on an independent and adequate state ground. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Jones v. Vacco*, 126 F.3d 408, 414 (2d Cir. 1997).

Petitioner's third amended claim was first raised on direct appeal, when he alleged that no witness's version of the events sufficiently evinced a depraved indifference to human life. (*See* Opp. Aff. Ex. A. at 23–35.) The Appellate Division found his claim to be unpreserved for appellate review, because trial counsel had not properly moved to dismiss the indictment on that ground at the close of the People's case. *See People v. Dupont*, 283 A.D.2d 587, 724 N.Y.S.2d 901 (App. Div. 2d Dep't 2001) (citing *inter alia People v. Gray*, 86 N.Y.2d 10, 652 N.E.2d 919 (1995); *People v. Pinder*, 704 N.Y.S.2d 482, 269 A.D.2d 547 (App. Div. 2d Dep't 2000)). "The Second Circuit has recognized that New York's preservation rule typically constitutes an independent and adequate state procedural ground on which the Appellate Division may deny a criminal defendant's appeal." *Kemp v. New York*, No. 07 Civ. 6996(RMB)(HBP), 2009 WL 306258, at *9 (S.D.N.Y. Feb. 9, 2009) (citing *Garcia v. Lewis*, 188 F.3d 71, 76–77, 79 (2d Cir. 1999); *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008); *Richardson v. Greene*, 497 F.3d 212, 217–18, 220 (2d Cir. 2007); *Brown v. New York*, 04-CV-1087 (NG)(WP), 2006 WL 3085704, at *2 (E.D.N.Y. Oct. 30, 2006)).

The transcript of the charge conference confirms that although trial counsel unsuccessfully attempted to include lesser charges of criminally negligent homicide and reckless endangerment, he did not challenge the sufficiency of the evidence against petitioner when Justice Kreindler addressed the depraved indifference count. (Tr. at 854–862, 874–76.) Under New York's contemporaneous objection rule, in order to preserve a claim protesting a court's ruling or instruction for appellate review, a party must voice a specific objection to the ruling or instruction "at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law § 470.05(2); *see People v. Luperon*, 85 N.Y.2d 71, 78, 647 N.E.2d 1243 (1995); *People v. Lopez*, 71 N.Y.2d 662, 665–66, 525 N.E.2d 5 (1988). Here, trial counsel waited until the sentencing hearing, after petitioner had been found guilty of depraved indifference murder, to raise his sufficiency challenge. (Tr., "Sentence" section, at 5–6.)

The Appellate Division's holding thus procedurally bars this Court from reviewing petitioner's claim, unless he can show cause for the default and actual prejudice, or "demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750 (internal citations and quotations omitted). A petitioner may establish cause by showing that the factual or legal basis for a claim was not reasonably available to counsel, or that interference by officials made compliance impracticable. *Id.* at 753; *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003). To satisfy the prejudice requirement, the alleged error must have worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres*, 316 F.3d at 152 (citations and internal quotation marks omitted).

Petitioner has not alleged that his counsel lacked a basis to mount a sufficiency challenge at the charge conference – a basis which somehow formed only after the jury returned the verdict. Nor has petitioner alleged that his trial counsel was constitutionally insufficient at the charge conference.[11] However, even if *arguendo* petitioner could establish "cause" for failing to preserve this claim at trial, he could not establish prejudice, as the Court finds the claim to be without merit.

In a federal *habeas* challenge to the sufficiency of evidence, the test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord Policano v. Herbert*, 507 F.3d 111, 115–116 (2d Cir. 2007). "[A]ll possible inferences that may be drawn from the evidence must be construed in the prosecution's favor." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (citations omitted). Furthermore, a federal court may neither "disturb the jury's findings with respect to the witnesses' credibility," *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989), nor "weigh conflicting testimony." *Fagon v. Bara*, 717 F. Supp. 976, 979 (E.D.N.Y. 1989) (citing *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989)). Under this "rigorous standard," a "federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. at 326).

At the time of petitioner's trial, a conviction of depraved indifference murder had to be supported by evidence that the defendant "[u]nder circumstances evincing a depraved

---

[11] Further, petitioner has not exhausted an independent Sixth Amendment challenge to his trial counsel's performance in this regard, as would be required to establish "cause." *See Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000).

indifference to human life . . . recklessly engage[d] in conduct which create[d] a grave risk of death to another person, and thereby cause[d] the death of another person." N.Y. Penal. Law § 125.25(2). The People had to prove not only that the defendant acted recklessly, but also that his act "was imminently dangerous and presented a very high risk of death to others and that it was committed under circumstances which evidence a wanton indifference to human life or a depravity of mind." *People v. Register*, 60 N.Y.2d 270, 274 (1983).[12] The phrase "depraved indifference to human life" focused not on the subjective intent of the defendant, but on an objective assessment of the degree of risk presented by the defendant's conduct. *Id*. at 277.[13]

In this case, the evidence, when viewed in the light most favorable to the People, supports the conclusion that petitioner's act of struggling with and ultimately shooting Profitt was imminently dangerous and presented a very high risk of death to others, and that the act was committed under circumstances which evinced a wanton indifference to human life or a depravity of mind. Testimony at trial established that, while Cush was addressing petitioner's brother Nolan Dupont, who had accosted Cush and Profitt on Foster Avenue, petitioner, accompanied by Derilus, approached them, drew a loaded semi-automatic gun, pointed it at Cush and Profitt, and told his brother to get out of the way because he was going to "baddy" Cush and Profitt, i.e., kill them. Petitioner's threat revealed that he knew his gun was loaded and that he

---

[12] Several New York state court decisions issued after petitioner's conviction "cut[] back" and "recast" the formulation of depraved indifference murder set forth in *Register*. *Policano v. Herbert*, 7 N.Y.3d 588, 600–02, 859 N.E.2d 484, 493–94 (2006). These decisions clarified that "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder." *Id*. at 601, 859 N.E.2d at 493 (quoting *People v. Payne*, 3 N.Y.3d 266, 272, 819 N.E.2d 634, 637 (2004)). Nevertheless, at the time that petitioner's conviction became final— January 10, 2002—*Register* reflected the sufficiency of evidence needed to establish guilt for depraved indifference murder. *See Epps v. Poole*, 10–2206–PR, --- F.3d ----, 2012 WL 2345382, at *8 (2d Cir. June 21, 2012) (affirming, upon review of Appellate Division decisions applying *Register* and *Payne*, that the *Register* formulation governed sufficiency challenge to a *habeas* petitioner's conviction that became final on December 15, 2003). Thus, *Register* must govern the instant review.

[13] "[U]nder the *Register formulation*, the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent-for example, a point-blank shooting of the victim in the head-likewise demonstrated depraved indifference." *Policano v. Herbert*, 507 F.3d at 115 (quoting *Policano v. Herbert*, 7 N.Y.3d at 600–01, 859 N.E.2d at 494).

was ready to do harm to Cush and Profitt. When Moffatt and Scantelbury attempted to subdue Nolan Dupont and Derilus, both of whom had begun to beat Cush, petitioner pointed his loaded gun at Moffatt and Scantelbury and warned them to back up. When Profitt then came up behind petitioner to subdue him and prevent him from shooting anyone, petitioner struggled with Profitt, ultimately firing the gun at Profitt's upper chest and then fleeing the scene.

The shooting of Profitt in the upper chest was imminently dangerous and presented a grave risk of death. Further, a rational jury could find that the circumstances under which the shooting occurred—drawing and displaying of a loaded semi-automatic gun on a commercial street in Brooklyn; pointing the gun at two people some distance away and threatening to kill them for no clear reason; moments later, again pointing the gun at other individuals and threatening them; struggling with one of the originally targeted individuals while still holding onto the loaded weapon; firing that weapon into his upper chest; and immediately fleeing the scene without summoning aid for the wounded individual—evinced a depraved indifference to human life.

Because trial counsel failed to challenge the sufficiency of the evidence until long after the court had an opportunity to effectively change its charge to the jury, and because in any event the jury could have rationally concluded that the killing comprised all the elements of a depraved indifference murder, petitioner's third *habeas* claim is denied.

### D.  Petitioner's Fourth Amended Claim (Insufficiency of Appellate Counsel)

In his fourth amended claim, petitioner argues that his appointed appellate counsel was constitutionally ineffective. Petitioner alleges that appellate counsel (1) should have challenged trial counsel's sufficiency for failing to object to certain hearsay and to the introduction of a certain weapon at trial, and (2) should have challenged the prosecution's exercise of peremptory

30

strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986). Petitioner raised these claims in his first and second *coram nobis* motions. The Appellate Division dismissed both proceedings under *Jones v. Barnes*, 463 U.S. 745, 754 (1983), which held that a criminal defendant has no constitutional right to make appellate counsel raise every nonfrivolous issue requested by a client. These decisions constitute denials on the merits. *See, e.g.*, *Meeks v. Artus*, No. 10 Civ. 4021(BMC), 2011 WL 703938, at *4 (E.D.N.Y. Feb. 17, 2011).

Because the Appellate Division denied petitioner's claims on the merits, petitioner must show that its decisions were contrary to or an unreasonable application of Supreme Court authority. The Supreme Court authority behind petitioner's claim is *Strickland v. Washington*, 466 U.S. 668 (1984), which applies to claims of ineffective assistance of trial and appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992). To establish a claim of ineffective assistance of counsel, a petitioner must demonstrate: (1) that "counsel's representation fell below an objective standard of reasonableness"; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 669. In applying this standard, judicial scrutiny of counsel's actions must be highly deferential. *Id.* at 689. A petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). In order to establish prejudice, a petitioner must show "that there was a reasonable probability that [his] claim would have been successful" on appeal. *Id*. at 534 (citing *Claudio*, 982 F.2d at 803).

Petitioner alleges that the prosecution elicited hearsay from Detective Steven G. Hector, who implied that Cush identified petitioner in a lineup shortly before petitioner was arrested. As an initial matter, Detective Hector never affirmatively stated that Cush identified petitioner, so his testimony was not *per se* hearsay. Whether or not Hector's testimony nevertheless constituted "third-party bolstering" prohibited under New York law, *see People v. Trowbridge*, 305 N.Y. 471 (1999), petitioner has not come close to establishing that withdrawal of that testimony would have yielded a different result. Cush identified petitioner in court as the shooter. Moffatt and Scantelbury also identified petitioner at trial, and evidence corroborated their identification. Petitioner has not shown a reasonable probability that the remaining and repeated identifications of petitioner at trial, along with the ballistics evidence linking petitioner to the shooting, would not have been sufficient to support his conviction. Accordingly, since any objection by trial counsel was unlikely to affect the proceedings, appellate counsel was not deficient in failing to challenge trial counsel's performance in this regard.

Petitioner further alleges that a weapon with no relevance to the case was improperly introduced as evidence at trial, prejudicing the jury by demonstrating that he "kept illegal weapons," and leading to the inference that he "was a criminal." (Opp. Aff. Ex. H at 6.) At trial, Detective Miguel Roman testified that he uncovered two guns on the roof of the building where petitioner lived. The prosecution then presented an evidence pouch mistakenly containing three guns: a nickel-plated gun found on petitioner's roof; a .357 magnum revolver also found on the roof; and a third, unrelated weapon. Trial counsel immediately objected to the presence of third weapon. The prosecutor admitted that it was included in error, and had it removed from the pouch. The jurors were instructed that the third weapon had nothing to do with the case, and the trial proceeded without the introduction of the third weapon into evidence. (Tr. at 701–05.) Juries

are presumed to understand and follow such curative instructions. *Roldan v. Artuz*, 78 F. Supp. 2d 260, 281 (S.D.N.Y. 2000) (collecting cases).

Petitioner now appears to argue that trial counsel should have also prevented the introduction into evidence of the second weapon, which Detective Roman found at the same time and at the same location as the murder weapon. However, even if trial counsel had also prevented the second gun from being introduced into evidence, the jury would nevertheless have concluded that petitioner kept at least one illegal weapon, since all three witnesses described petitioner as holding a weapon which matched the first gun, and since that gun matched evidence found at the crime scene. Petitioner also did not challenge the admissibility of Detective Roman's testimony that he uncovered both guns in his search for the murder weapon, nor Cush's testimony that immediately after the shooting he had seen two guns on the ground and observed petitioner scoop up both guns before leaving the scene. (*See* Tr. at 354–55.) Therefore, introducing the second gun into evidence, even if erroneous, had a *de minimis* prejudicial effect.

Finally, as for petitioner's *Batson* claim, petitioner himself challenged his trial counsel's handling of this matter in a *pro se* supplemental appellate brief, a contention that was found to be "without merit." *People v. Dupont*, 283 A.D.2d at 587, 724 N.Y.S.2d at 901. "The failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a criminal defendant is] entitled." *Aparicio*, 269 F.3d at 99 (citations and inner quotations omitted); *see also Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir.1993) ("The Sixth Amendment does not require [appellate] counsel ... to press meritless arguments before a court."); *Samet v. United States*, 09 Civ. 5190(CM) & 01 Cr. 216(CM), 2011 WL 5548012, at *10 (S.D.N.Y. Nov. 14, 2011); *Prendergast v. Rivera*, 06 Civ. 5314 (BMC), 2011 WL 4899945, at *7 (E.D.N.Y. Oct. 13, 2011). Moreover, because trial counsel did not object to the court's

ultimate finding that a *prima facie* case of discrimination had not been made out, any later challenge by appellate counsel would have been procedurally barred by New York's contemporaneous objection rule, and petitioner has shown no reason why the Appellate Division would have waived that bar. In any event, the record does not indicate that the racial composition of the jury was inappropriate or that any imbalance, if it existed, might have affected the verdict. *See, e.g.*, *Morales v. Greiner*, 273 F. Supp. 2d 236, 253 (E.D.N.Y. 2003).

Because petitioner has not shown that the Appellate Division's denials of his claims of ineffective assistance of appellate counsel were contrary to or an unreasonable application of *Strickland*, and because the claims in any event lack merit, petitioner's fourth *habeas* claim is denied.

### E.  Petitioner's Fifth Amended Claim (Ineffective Assistance of Trial Counsel)

Petitioner's fifth amended claim challenges that if the State actually provided petitioner's trial attorney with police vouchers evincing possession of the decedent's clothing, the failure to utilize this information at trial or to seek the vacatur of petitioner's conviction constituted ineffective assistance under *Strickland*. Petitioner raised this claim in his second § 440 proceeding, arguing that "the presence or absence of ballistic evidence on the decedent's clothing directly supported one of Dupont's defenses," and that his counsel, if aware that the clothing had been vouchered, had no strategic justification for failing to use it in petitioner's defense. (Opp. Aff. Ex. M at 24, 47–48.) In ruling on petitioner's second § 440 motion, the justice found that "the police reports" were "available to the defense," but that petitioner's claim of ineffective assistance of trial counsel was nevertheless "totally without merit." (Opp. Aff. Ex. O at 2–4.) This Court agrees.

Belated tests on the clothing and murder weapon established that the victim was shot from a distance no greater than 18 inches. (Opp. Aff. Ex. N at 11.) Despite argument to the contrary, petitioner has advanced no plausible characterization of the events of June 4, 1997—at trial or in the present proceedings—under which evidence of a close-range shooting would have somehow exculpated him, such that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 669. Petitioner suggests that if his counsel truly knew of the vouchers before trial, counsel should have ordered testing on the clothing and, upon finding evidence of a close-range shooting, should have adopted a defense strategy focused solely on establishing that petitioner committed manslaughter. (Opp. Aff. Ex. N at 23.) Petitioner has not overcome this Court's "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Assuming counsel knew or could have known of the vouchers, petitioner has not shown how the apparent decisions to wait to see if the People would test the clothing and enter it in evidence, and, when they did not, to argue that the evidence at trial was insufficient to convict petitioner of murder or manslaughter, were not "sound trial strategy." *Strickland*, 466 U.S. at 689 (internal citations and quotation marks omitted). [14]

Accordingly, because petitioner has not shown that the New York Supreme Court's denials of his claims of ineffective assistance claims were contrary to or an unreasonable

---

[14] Petitioner also suggests in his second § 440 motion, but not in his *habeas* filings, that early ballistic tests of the clothing, even if not exculpatory, might have "placed him in a stronger position for plea bargaining purposes." (Opp. Aff. Ex. N at 24.) Petitioner provides no explanation of how such inculpatory findings could have benefited him. In any event, petitioner has not made the necessary showing under *Strickland* to establish that ineffective assistance caused him to lose the benefit of a plea bargain. *See Lafler v. Cooper*, 132 S.Ct. 1376 (2012). Even if *arguendo Lafler* reflects federal law which was "clearly established" as of the time of petitioner's trial and collateral proceedings, petitioner cannot avail himself of its holding, because petitioner has not alleged that a plea deal was ever offered by the People. *See id.* at 1387 ("If no plea offer is made, or a plea deal is accepted by the defendant but rejected by the judge, the issue raised here simply does not arise.").

application of *Strickland*, and because the claims in any event lack merit, petitioner's fifth *habeas* claim is denied.

### F.  Petitioner's Sixth Amended Claim (Sanctions)

Petitioner's sixth and final amended claim alleges that the People should have been sanctioned for failure to provide petitioner with the victim's clothing. Petitioner's memorandum of law wholly fails to address this claim, which was initially raised in his first § 440 proceeding. The New York Supreme Court, Kings County found that the claim was procedurally defaulted, because although the claim was based on facts appearing on the record, petitioner's appellate counsel failed to raise the claim on direct appeal. (Opp. Aff. Ex. G at 2); *see* N.Y. Crim. Proc. Law § 440.10(2)(c). Procedural default under § 440.10(2)(c) is an adequate and independent procedural bar to *habeas* review. *See Sweet v. Bennett*, 353 F.3d 135, 139–40 (2d Cir. 2003); *Aparicio*, 269 F.3d at 90; *see, e.g.*, *Nelson v. Heath*, No. 11–CV–02183 (JG), 2011 WL 4711763, at *9 (E.D.N.Y. Oct. 3, 2011).

Petitioner has not alleged, let alone established, "cause" and "prejudice" for this default, as is required to excuse a procedural default. *See Sweet*, 353 F.3d at 141. The basis for this claim was clearly available to his appellate counsel, who argued on appeal that the trial court should have ordered a hearing to determine whether the prosecution possessed the deceased clothing. Nor has Petitioner shown how failure to sanction the prosecution was an error of constitutional dimension, or how a fundamental miscarriage of justice thereby occurred.

Accordingly, because petitioner's claim for sanctions is procedurally defaulted, and otherwise for the reasons set forth *supra* with respect to petitioner's *Brady* claim, petitioner's sixth *habeas* claim is denied.

**CONCLUSION**

For the reasons above, petitioner's claims are without merit and petitioner's amended

*habeas corpus* petition (Doc. No. 12) is DISMISSED in its entirety. A certificate of appealability

should not be issued. The Clerk of Court is directed to dismiss this petition, mail a copy of this

Memorandum and Order to petitioner, and close the file in this court.

SO ORDERED.


Dated: Brooklyn, New York
        June 26, 2012

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge